IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EMMITT WEATHERSOON, | ) |
| Petitioner, | ) |
| v. | ) No. 13 C 8621 |
| RICK HARRINGTON, | ) |
| Respondent. | ) |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

On September 6, 2006, a jury convicted petitioner Emmitt Weatherspoon ("Weatherspoon") of first-degree murder. Weatherspoon was sentenced to 45 years in prison, which he is currently serving at Menard Correctional Center in Menard, Illinois.

On December 2, 2013, Weatherspoon filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Dkt. No. 1.) On April 7, 2014, the State of Illinois ("State"), on behalf of respondent Warden Rick Harrington, filed an answer to Weatherspoon's petition. (Dkt. No. 14.) The court allowed Weatherspoon until July 9, 2014 to file a reply, (Dkt. No. 16), and subsequently granted Weatherspoon's motion to extend the deadline until September 2, 2014 (Dkt. No. 18). On August 25, 2014, however, Weatherspoon filed a letter stating that he would not be able to draft a reply without legal assistance and wished to "move forward as is with [his] petition."[1] (Dkt. No. 19.) The court thus considers Weatherspoon's § 2254 petition ripe for ruling. For the reasons explained below, Weatherspoon's petition for a writ of habeas corpus is

---

[1] Weatherspoon's letter states that he previously received assistance from a fellow inmate who has since been transferred. (Dkt. No. 19 at 1.)

denied.

## BACKGROUND

The following factual summary was set forth by the Appellate Court of Illinois for the First Judicial Circuit ("Illinois Appellate Court") in Weatherspoon's direct appeal, *People* v. *Weatherspoon*, 394 Ill. App. 3d 839, 915 N.E.2d 761, 333 Ill. Dec. 690 (Ill. App. Ct. 1st Dist. 2009)[2]:

> [Weatherspoon] was charged with aggravated criminal sexual assault and first-degree murder after Sylvia Chambers was found dead in a garbage can in the alley behind [Weatherspoon's] home.
>
> **A. Motion *in limine***
>
> Before trial, which began August 1, 2006, [Weatherspoon] made an oral motion *in limine* to bar the State from presenting his theft conviction from 1997. The trial court found the motion premature and ruled that it would determine the relevancy of [Weatherspoon's] conviction if and when [Weatherspoon] testified.
>
> [Weatherspoon] testified on his own behalf at the trial. Afterward, the State sought to admit [Weatherspoon's] convictions for robbery and theft. [Weatherspoon] was convicted of robbery on July 21, 1995, and his probation was terminated in April 1997. He was convicted of theft on April 17, 1997. [Weatherspoon] requested that both convictions be barred because they were more prejudicial than probative, especially given the remoteness of the robbery conviction.
>
> The trial court determined that both cases affected [Weatherspoon's] credibility. Although both convictions "tend not to be recent," the court noted that [Weatherspoon] was outside the jurisdiction from 2001 through 2004. Furthermore, where [Weatherspoon] was being tried for crimes of violence, the theft and robbery convictions "lack any similarity to what is before this jury." After balancing the probative value of the convictions against the danger of unfair prejudice, the trial court permitted the State to present evidence of the convictions.

---

[2] The court accepts as true the Illinois Appellate Court's recitation of the facts. *See* 28 U.S.C. § 2254(e)(1); *Whitman* v. *Bartow*, 434 F.3d 968, 969 (7th Cir. 2006).

2

## B. Evidence Presented at Trial

Chambers was last seen alive on July 21, 1999, at 12:30 a.m., when she sat in a car, drinking with her friend. The next morning, her body was discovered in a garbage can in the alley behind 1145 West 112th Place in Chicago. While the police were investigating and processing the scene, neighbors saw [Weatherspoon] in the alley, sitting on the back of a paddy wagon.

Brian Smith, a forensic investigator for the Chicago police, testified that the body was wrapped in black sheeting. He also discovered a purple towel, which was in the alley, and a pair of pliers and a blue plastic bag, which were in the front yard of 11257 South Racine.

Detective Steven Brownfield testified that on July 22, 1999, after speaking to a witness, he went to 11254 South May looking for [Weatherspoon], but no one was there. The next day, the police executed a search warrant on the house. In the rear bedroom, they found several knives lying around and a belt that had blood on its buckle. The bedsheets were "quite soiled" and appeared to be stained. They put a "stop order" on [Weatherspoon] but were unsuccessful in locating him.

Five years later, in November 2004, Chicago police officer Ted Przepiora was working on the Chambers case with the cold case squad. He testified that on November 3, 2004, he talked to Tanis Wildhaber of the State Police crime lab concerning the work up of evidence recovered during the investigation. Przepiora testified that Wildhaber gave him "some information about some positive findings on some DNA analysis." Based on that information, he "further investigate[d] a possible location of a suspect," *i.e.,* [Weatherspoon], in Grand Rapids, Michigan. He contacted the Michigan Federal Bureau of Investigation task force, and on November 8, 2004, he, an assistant State's Attorney, and other detectives traveled to Grand Rapids.

Grand Rapids police officer Daniel Lubbers testified that on November 9, 2004, he went to [Weatherspoon's] place of employment and arrested him. He transported [Weatherspoon] to the police station and contacted the Chicago police detectives to inform them that [Weatherspoon] was in custody. The detectives arrived at the police station at 9:30 or 9:45 a.m.

Przepiora and another detective spoke to [Weatherspoon] in an interview room almost immediately after arriving. They read [Weatherspoon] his *Miranda* rights, which he said he understood. Przepiora told him that they were investigating the murder of Sylvia Chambers, which occurred on July 21, 1999. At first, [Weatherspoon] denied involvement and claimed that he had left the Chicago area in 1998. However, after officers confronted him with crime scene photos, which showed that he was there, and witness statements that placed him at the scene the day of the murder, [Weatherspoon] said that his and the victim's DNA would be found in his bedroom. [Weatherspoon] told Przepiora that he and Chambers agreed

3

to smoke crack cocaine in exchange for sex. He purchased two bags of rocks from the dealer down the alley, returned to his bedroom, and smoked the cocaine with Chambers. He then had sex with Chambers, during which time he ejaculated on her chest. Afterward, Chambers, dressed only from the waist up, demanded more cocaine, but he refused and asked her to leave. She became enraged, and a struggle ensued.

As Chambers struggled with [Weatherspoon], he removed his belt, put it around her neck, and twisted it. Chambers continued to struggle; he released the belt and put his hands around her neck. He then reached for a Swiss Army knife and stabbed her in the neck. After he stabbed her, she began gasping for air and died a short time later. [Weatherspoon] got black landscaping plastic from the kitchen and wrapped Chambers's body in it. He placed her body in a garbage can in the alley behind his house. When he returned to the house, he wrapped the knife he used to stab Chambers in her pants and then put the pants in a television cabinet in the basement of the house.

When the police arrived, he went outside and watched them process the scene. After the police left the area, he approached his sister Shalonda and told her he had been involved in a murder. He asked her to drive him to Altgeld Gardens, where he stayed for one or two days. He then drove to his sister Nicole's house in Grand Rapids. Nicole confronted him with the fact that he showed up at her door with only the clothes on his back, and he confided that he had been involved in a murder in Chicago and could not return.

During Przepiora's conversation with [Weatherspoon], he showed him pictures of the scene. [Weatherspoon] identified the belt he used on Chambers.

After his discussion with [Weatherspoon], Przepiora left the room and informed Assistant State's Attorney Rob Robertson of [Weatherspoon's] statement. Robertson, the detectives, and [Weatherspoon] moved to a larger conference room, where Robertson also advised [Weatherspoon] of his rights.

Robertson testified that after the detectives interviewed [Weatherspoon], they informed him that [Weatherspoon] agreed to talk to him. Robertson advised [Weatherspoon] of his constitutional rights, which [Weatherspoon] said he understood. After [Weatherspoon] talked to Robertson about the murder of Sylvia Chambers, Robertson explained the ways that [Weatherspoon] could memorialize his statement. [Weatherspoon] chose to give a videotaped statement, so [Weatherspoon], Robertson, and the detectives signed the consent form.

In the videotaped statement, [Weatherspoon] said that the murder had been weighing on his mind for five years. He stated that on July 21, 1999, he smoked crack in his bedroom, which was at the back of the house, located at 11254 South May. Afterward, he sat on the front porch, where he saw Chambers, whom he knew as "Baby Girl" walking down the street. The two talked about exchanging crack for

4

sex, so [Weatherspoon] went down the street and purchased two dime bags of crack. The two smoked crack in his bedroom and then had sex. Afterward, Chambers asked for some of [Weatherspoon's] crack, but when he said no, she became angry and began yelling.

[Weatherspoon] told Chambers to leave; he was concerned that his sister would come home and discover that he was smoking crack, as he had promised her he would not smoke crack anymore. He tried to push Chambers, who was only wearing a shirt, out the door, but she began "fighting me, swinging me." He pushed her, and she hit the wall and told him he was going to get "f - - ked up" if he did not let her go. As she came at him in a "raging force," [Weatherspoon] pulled the belt out of his pants and "wrapped the belt around her neck to try to calm her down." He told her to get "the f - - k out of my house" as she scratched his face and neck. He let the belt go and grabbed her, but she was slippery and still refused to leave.

Chambers said that she was going to get paid one way or the other, even if she had to get people to jump him. [Weatherspoon] then grabbed her around the neck and squeezed to "try to put some fear inside of her." Tired and frustrated, he let her go, but she continued to fight, so he grabbed his Swiss Army knife. She seemed to be reaching for her pants before she came at him again. Although she had nothing in her hands, [Weatherspoon] stabbed her in the neck. Chambers started choking and appeared to be dying. [Weatherspoon] "freaked out" and got a heavy duty black plastic bag from the kitchen. When he returned to his bedroom, Chambers was dead, so he wrapped her body in the bag and cleaned as much blood off the floor as he could. He got a neighbor's garbage can from the alley, rolled it to the side of his house, dumped her body in it, and put the garbage can back in the alley.

The next morning, he heard that her body had been discovered and went outside to watch the police investigation because he needed confirmation that the murder was not just a "crack dream." A neighborhood drug dealer who was related to Chambers found out that he had something to do with her murder, so he left the neighborhood. He stayed at Altgeld Gardens and then visited his son in Riverdale. While he was in Riverdale, his son's mother called the police, so when they came, he waited in a tree until they left. Trying to "forget everything [he] did in Chicago and start another life," [Weatherspoon] went to Grand Rapids.

During the videotaped statement, [Weatherspoon] said that the police and Robertson had treated him "nice" and he had no complaints.

Amy Hart, a forensic scientist for the Illinois State Police, testified that no fingerprints suitable for comparison were found on the three knives, but she found a shoe impression on one of them. She could not find any fingerprints on the plastic sheeting because it was covered with reddish-brown flakes, which appeared to be blood. The parties stipulated that no latent prints suitable for comparison were found on the garbage can.

Robert Berk, a trace evidence analyst, testified that he found the same green and black plastic material on the bedspread, fitted sheet, and pillowcase, as well as the T-shirt, bra, and hair tie recovered from Chambers's body. He could not identify what the substance was. No semen was found on Chambers's T-shirt and bra.

The parties also stipulated that Chambers's blood was found on the belt recovered from [Weatherspoon's] house. The bedspread contained a DNA mixture of three people; [Weatherspoon] could not have contributed to the mixture, but the female DNA profile matched Chambers's profile. In addition, a pair of jeans found in the back bedroom contained the DNA of two people. One of the DNA profiles matched [Weatherspoon's], and Chambers could not be excluded from contributing to the other profile.

The medical examiner testified that Chambers was strangled. There was also a stab wound on the side of her neck that went into her voice box. This injury was not fatal by itself. In addition, she had abrasions and bruises to her face, indicating blunt force trauma. Although there was no evidence of injury to her vagina, she had bruises on her thighs that, according to the medical examiner, were consistent with having her legs pried apart. Chambers's fingernails were very short, so they could not be clipped for evidence. Chambers had alcohol and benzoylecgonine, a breakdown product of cocaine, in her system.

[Weatherspoon] testified on his own behalf. He denied knowing Chambers, taking her to his house, smoking crack with her, having sex with her, or killing her. He testified that in July 1999, he was living with his sister, her children, and her boyfriend at 11254 South May. His bedroom was in the basement. The rear bedroom that the police identified as the location where the murder occurred was not [Weatherspoon's] bedroom; rather, it was an "open room" where company could drink or play cards.

On July 20, 1999, he went to a party that an "associate" of his, James Tutson, had in Riverdale. Someone named Ray, whose last name [Weatherspoon] did not know, picked him up at 11:30 p.m. and drove him to the party, and he did not return home until 6 a.m. After changing his clothes in his basement bedroom, [Weatherspoon] drank a beer in the family room, where he slept until a loud noise woke him up. He looked out the kitchen window and, seeing a crowd of people in the alley, went outside and saw Chambers's body. While he was outside, he spoke to the police and his neighbors.

He continued to stay at 11254 South May for three days; however, he had a conversation with a "group of guys," which included Chambers's brother, and left for Michigan the same day. He lived in Michigan with his fiancée until the time of his arrest in November 2004.

After [Weatherspoon] was arrested, he told the detectives that he knew

nothing about the murder. However, the detectives threatened him and told him details about the murder. In addition, the police did not inform him of his constitutional rights. He asked to call his attorney, but the police would not let him. The police told him that they found his DNA and fingerprints, which he said was impossible.

The detectives left and then returned for a second conversation. [Weatherspoon] continued to deny involvement in the murder. He testified that the police threatened to tell his employer and building manager what he was arrested for and threatened to tell the victim's family where he lived. [Weatherspoon] eventually confessed because he was tiring of the interrogation and "was feeling feared for my family safety." The detectives told him he could get time for first-degree or second-degree murder, and if [Weatherspoon] did not tell Robertson exactly what they told him, then they would reject the deal and have Robertson charge him with first-degree murder. He lied in the videotaped statement and only repeated the statement that the detectives gave him before they met with Robertson.

On rebuttal, Przepiora testified that [Weatherspoon] was also known as James Tutson. When he interviewed [Weatherspoon] in Grand Rapids, [Weatherspoon] did not say that he had gone to a party the night of July 20, 1999, or that he left Chicago because of a conversation he had with a member of the victim's family. [Weatherspoon] never asked for an attorney, and Przepiora did not advise him not to ask for one. He did not threaten [Weatherspoon].

The jury found [Weatherspoon] guilty of first-degree murder and not guilty of aggravated criminal sexual assault.

### C. Sentencing Hearing

On the date that [Weatherspoon's] case was set for sentencing, defense counsel asked the trial court to postpone the sentencing hearing. After receiving a copy of the presentence report (PSI), defense counsel argued that he was not prepared to present mitigation evidence. The court, however, noted that "what's contained in the PSI is pretty *pro forma*. I mean, they get this information from your client. So I can't imagine there's anything startling in there that he would be confronted with." The court passed the case and allowed [Weatherspoon] and his counsel to discuss the PSI and "see what it is that may be a problem." [Weatherspoon] corrected several items in the PSI, and the request for continuance was denied.

Defense counsel further requested that the trial court bifurcate the sentencing hearing. After the State presented evidence in aggravation, [Weatherspoon] presented the following offers of proof: that Mary Shaw, [Weatherspoon's] fiancée, would testify that she was living with him in Michigan and that he worked to support her and her children; that Frankie Rattiff, [Weatherspoon's] maternal grandmother, would testify that he presented himself to

her as a devoted family man, and while he was in Michigan, he called her regularly; and that William Slate, [Weatherspoon's] neighbor, would testify that [Weatherspoon] did odd jobs for him and that he found [Weatherspoon] to be courteous and respectful. The trial court noted that the testimony from Shaw and Rattiff was supported by the PSI, and Slate had testified during the trial, so "all of that material is presently before the Court in some form or another." Noting that bifurcating the sentencing hearing would require Chambers's relatives from Florida and St. Louis to return, the court denied [Weatherspoon's] motion and sentenced him to 45 years' imprisonment.

*Weatherspoon*, 915 N.E.2d at 764-69 (filed in this case as Dkt. No. 15 Ex. G).

## WEATHERSPOON'S DIRECT APPEAL ARGUMENTS

In his direct appeal to the Illinois Appellate Court, Weatherspoon argued:

1. The trial court interfered with his right to testify when it deferred ruling on his motion *in limine* to bar the State from the introduction of one of his prior convictions until he testified ("Claim 1");

2. He was denied his right to present a defense when he was not permitted to testify about a conversation he had with Chambers' brother that caused him to leave Chicago ("Claim 2");

3. The trial court erred in admitted Detective Przepiora's testimony regarding a DNA analysis that implied Weatherspoon's DNA was on file at the state crime lab as a convicted felon ("Claim 3");

4. The State's comments in closing arguments only served to inflame the passions of the jury ("Claim 4");

5. The trial court erred at sentencing by:

    i. Refusing to give Weatherspoon three days to review his presentence investigation report;

    ii. Refusing to bifurcate the sentence hearing; and

    iii. Imposing a sentence that was excessive because it was more than twice the minimum sentence for first-degree murder (collectively, "Claim 5").

## ILLINOIS COURT PROCEEDINGS

On November 26, 2008, the Illinois Appellate Court rejected Weatherspoon's arguments and affirmed his conviction. (Dkt. No. 15-1 at 1-31.) On Claim 1, the Illinois Appellate Court

8

held that the trial court did not err when it refused to rule on Weatherspoon's motion *in limine* until after he testified. (*Id.* at 21-25.) The Illinois Appellate Court held that Weatherspoon had forfeited Claims 2 and 3 because he failed to raise them in his post-trial motion. (*Id.* at 11-21.) The court rejected Claim 4 because it concluded the State's comments during closing arguments were not, in fact, erroneous. (*Id.* at 28.) And on Claim 5, the Illinois Appellate Court held that the trial court did not abuse its discretion by denying Weatherspoon's motions for a continuance and to bifurcate the sentencing hearing, nor did the trial court abuse its discretion by imposing a 45-year sentence. (*Id.* at 28-30.)

On December 15, 2008, Weatherspoon filed a petition for rehearing, (*id.* at 86), which the Illinois Appellate Court denied on January 2, 2009 (*id.* at 137). Shortly thereafter, Weatherspoon filed his first petition for leave to appeal ("PLA I") to the Illinois Supreme Court. In PLA I, Weatherspoon raised only Claims 1 and 2. (*Id.* at 85-103.) On March 25, 2009, the Illinois Supreme Court denied PLA I, but entered a supervisory order directing the Illinois Appellate Court to vacate its order and reconsider Weatherspoon's appeal in light of the Illinois Supreme Court's decision in *People* v. *Patrick*, 908 N.E.2d 1 (Ill. 2009). *See People* v. *Weatherspoon*, 902 N.E.2d 1081 (Ill. 2009).

On September 9, 2009, the Illinois Appellate Court issued a new opinion, again affirming Weatherspoon's conviction. *People* v. *Weatherspoon*, 915 N.E.2d 761 (Ill. App. Ct. 1st Dist. 2009). The Illinois Appellate Court rejected Claims 2 through 5 for the same reasons stated in its November 26, 2009 Rule 23 order. *Id.* at 769-775, 779-782. On Claim 1, however, the Illinois Appellate Court held that the Illinois Supreme Court's decision in *Patrick* mandated a different result. In light of *Patrick*, the Illinois Appellate Court held that the trial court's refusal to entertain Weatherspoon's motion *in limine* before he testified—a decision the trial court made

9

pursuant to a blanket policy of deferring ruling on such motions until after a defendant testifies—was an abuse of discretion. *Id.* at 777.

The Illinois Appellate Court nevertheless rejected Weatherspoon's argument seeking a reversal of his conviction because the Illinois Appellate Court determined that the trial court's error was harmless beyond a reasonable doubt. *Id.* 778-79.

Following the Illinois Appellate Court's ruling, Weatherspoon filed a second petition for leave to appeal ("PLA II") to the Illinois Supreme Court raising only Claim 1. (Dkt. No. 15-2 at 21.) On November 25, 2009, the Illinois Supreme Court denied PLA II. (*Id.* at 74.) Weatherspoon chose not to petition the United States Supreme Court for a writ of certiorari. (Dkt. No. 1 at 2.)

On April 29, 2010, Weatherspoon filed a *pro se* post-conviction petition under the Illinois Post-Conviction Hearing act, 725 ILCS 5/122-1, which did not raise any of the issues set forth in his direct appeal or his habeas petition currently before this court. (Dkt. No. 15-5 at 58-78.) On November 13, 2012, the Illinois Appellate Court issued a summary order affirming the trial court's dismissal of Weatherspoon's post-conviction petition. (Dkt. No. 15-2 at 75-76.)

## FEDERAL COURT PROCEEDINGS

On December 2, 2013, Weatherspoon filed a federal habeas petition in this court. (Dkt. No. 1.) Weatherspoon's petition raises the same five claims presented to the Illinois Appellate Court on his direct appeal:

1. The trial court interfered with his right to testify when it deferred ruling on his motion *in limine* to bar the State from introducing one of his prior convictions until he testified ("Claim 1");

2. He was denied his right to present a defense when he was not permitted to testify about a conversation he had with Chambers' brother that caused him to leave Chicago ("Claim 2");

10

3. The trial court erred in admitting Detective Przepiora's testimony regarding a DNA analysis that implied Weatherspoon's DNA was on file at the state crime lab as a convicted felon ("Claim 3");

4. The State's comments in closing arguments only served to inflame the passions of the jury ("Claim 4");

5. The trial court erred at sentencing by:

    i. Refusing to give Weatherspoon three days to review his presentence investigation report;
    ii. Refusing to bifurcate the sentence hearing; and
    iii. Imposing a sentence that was excessive because it was more than twice the minimum sentence for first-degree murder (collectively, "Claim 5").

(Dkt. No. 1 at 5-6A.) The State urges this court to deny all of the claims set forth in Weatherspoon's petition.

## LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104–132, 110 Stat. 1214, a state petitioner seeking a writ of habeas corpus in federal court must first exhaust the remedies available to him in state court, 28 U.S.C. § 2254(b)(1)(A), "thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights," *Cheeks* v. *Gaetz*, 571 F.3d 680, 685 (7th Cir.2009) (internal quotation marks omitted). If a petitioner has failed to assert his federal claims at each level of state review, his claims are procedurally defaulted. *Woods* v. *Schwartz*, 589 F.3d 368, 373 (7th Cir.2009). A claim is also procedurally defaulted when a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, rendering the state court's refusal to adjudicate the claim an independent and adequate state ground for denying federal review. *Cone* v. *Bell*, 556 U.S. 449, 465 (2009). Both types of procedural default preclude federal court review of a petitioner's

habeas claims. *See Mulero* v. *Thompson*, 668 F.3d 529, 536 (7th Cir.2012). A habeas petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice from the default, or by showing that the court's failure to consider the claim would result in a fundamental miscarriage of justice. *See House* v. *Bell*, 547 U.S. 518, 536 (2006); *Coleman* v. *Thompson*, 501 U.S. 722, 750 (1991). A fundamental miscarriage of justice occurs when a habeas petitioner establishes that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray* v. *Carrier*, 477 U.S. 478, 496 (1986). Consequently, although procedural default generally precludes federal habeas review, it may be excused in certain circumstances.

If a petitioner's claims are not procedurally defaulted, or if the default is excused, a federal court must consider the merits of his or her federal habeas claims. But under AEDPA, a federal court may not grant habeas relief unless the state court's decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). A state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law" or "if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts." *Williams* v. *Taylor*, 529 U.S. 362, 412–13 (2000). Alternatively, under the "unreasonable application" prong of the AEDPA standard, a habeas petitioner must demonstrate that the state court unreasonably applied the (correctly identified) law to the facts of the case. *Id.* at 413. But just because a federal court independently concludes that the relevant state-court decision erroneously applied clearly established federal law does not mean the court should automatically grant the writ; rather, the state court's application must be objectively unreasonable. *Lockyer* v. *Andrade*, 538 U.S. 63, 75–76 (2003).

"This is a difficult standard to meet; 'unreasonable' means 'something like lying well outside the boundaries of permissible differences of opinion.'" *Jackson* v. *Frank*, 348 F.3d 658, 662 (7th Cir. 2003) (quoting *Hardaway* v. *Young*, 302 F.3d 757, 762 (7th Cir. 2002)).

ANALYSIS OF WEATHERSPOON'S HABEAS CLAIMS

The State argues that each of Weatherspoon's five claims is procedurally defaulted or alternatively meritless. The court will address the claims in reverse numeric order, starting with the last three.

I. Claims 3, 4, and 5

As a threshold matter, Claims 3, 4, and 5—alleging improper admission of testimony regarding DNA evidence, prosecutorial error in closing argument, and state-law sentencing errors—are procedurally defaulted because Weatherspoon failed to assert them through a full round of state court review. He raised each claim before the Illinois Appellate Court on direct appeal, but he did not raise any of the claims in either of his two petitions for leave to appeal to the Illinois Supreme Court. Because he never raised Claims 3, 4, and 5 before the Illinois Supreme Court, Weatherspoon forfeited the right to bring those claims in a federal habeas action. *See, e.g.*, *Woods*, 589 F.3d at 373 ("Before seeking habeas relief, a petitioner must fairly present his federal claims at each level of the state's court for their review.")

Weatherspoon's defaults may be excused if he can establish cause and prejudice for the default, of if he can establish that the court's failure to consider the claims will result in a fundamental miscarriage of justice. Weatherspoon unfortunately makes no effort to excuse his defaults. His petition contains nothing but a bare recitation of his claims and he declined to file a reply to the State's answer. The court does not expect Weatherspoon to represent himself with the skill of a practicing attorney, but Weatherspoon's failure to file anything leaves the court

13

with nothing to liberally construe. Consequently, the court cannot excuse Weatherspoon's procedural default and therefore cannot consider the merits of Claims 3, 4, and 5.

II.  Claim 2

The State argues that Claim 2, which alleges a due process violation because Weatherspoon was not permitted to testify to his reasons for moving from Illinois to Michigan, is also procedurally defaulted. Although Weatherspoon presented Claim 2 to the Illinois Supreme Court in PLA I, the State argues that Claim 2 is nonetheless defaulted because the Illinois Appellate Court rejected it based on an independent and adequate state law ground. Generally, a federal court may not review a habeas claim if the state court's decision was based on an adequate and independent state law ground. *Promotor* v. *Pollard*, 628 F.3d 878, 885 (7th Cir. 2010). A state law ground is "independent" when the state court actually relied on the procedural bar as an independent basis for its decision. *Smith* v. *McKee*, 598 F.3d 374, 382 (7th Cir. 2010). If, on the other hand, the state court's decision rested largely on the merits of the claim, the state law ground is not independent. *Moore* v. *Bryant*, 295 F.3d 771, 774 (7th Cir. 2002).

Here, the Illinois Appellate Court unambiguously stated its basis for rejecting Claim 2 at the outset of its discussion: "[Weatherspoon] did not include [the] argument in his posttrial motion . . . [t]herefore, the issue is procedurally forfeited." *Weatherspoon*, 915 N.E.2d at 769-70. The court went on to review Claim 2 for plain error—and in fact concluded that the trial court should not have excluded Weatherspoon's testimony—but such an analysis does equate to a ruling on the merits. *See Miranda* v. *Leibach*, 394 F.3d 984, 992 (7th Cir. 2005) ("[A]n Illinois court does not reach the merits of a claim simply by reviewing it for plain error").

The state law ground—waiver—was likewise an adequate basis to reject Weatherspoon's claim. A state law ground is "adequate" when it is a firmly established and regularly followed

14

state practice at the time of application. *Smith*, 598 F.3d at 382 (citations omitted). Illinois law has long required that a criminal defendant preserve errors for appeal by objecting to them at the time of their occurrence and by including them in a written post-trial motion. *See People* v. *Enoch*, 522 N.E.2d 1124, 1130 (Ill. 1988) ("*Both* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial.") (emphasis original); *People* v. *Kitch*, 942 N.E.2d 1235, 1240 (Ill. 2011) (reaffirming rule); 725 ILCS 5/116-1 (codifying post-trial motion rule). Thus, the Illinois Appellate Court's rejection of Claim 2 because Weatherspoon failed to raise it in his post-trial motion was consistent with a firmly established and regularly followed Illinois practice at the time it was applied.

Weatherspoon's default on Claim 2, like his other defaults, can be excused. But because Weatherspoon has provided no argument to support his claims, the court has no occasion to consider to whether Weatherspoon can establish cause and prejudice for the default, or if the court's failure to consider Claim 2 will result in a fundamental miscarriage of justice. The court therefore finds that Claim 2, like Claims 3, 4, and 5, is procedurally defaulted.

III.  Claim 1

Claim 1, by contrast, has successfully run the procedural default gauntlet. In Claim 1, Weatherspoon alleges that the trial court violated his right to testify when it deferred ruling on his motion *in limine*, which sought to bar the State from introducing his prior convictions for impeachment purposes. Weatherspoon testified on his own behalf and the prosecution presented the prior convictions Weatherspoon sought to bar on cross-examination. On direct appeal, Weatherspoon challenged the trial court's refusal to provide a ruling before he testified and raised the issue again in his first petition for leave to appeal to the Illinois Supreme Court. As discussed above, the Illinois Supreme Court instructed the Illinois Appellate Court to reconsider

its ruling on Claim 1 in light of the Illinois Supreme Court's decision in *Patrick*. The Illinois Appellate Court did as instructed and determined that, in light of *Patrick*, the trial court's refusal to entertain Weatherspoon's motion *in limine* before he testified was an abuse of discretion. *Weatherspoon*, 915 N.E.2d at 777. But the Illinois Appellate Court did not overturn Weatherspoon's conviction because it concluded the error was harmless beyond a reasonable doubt. *Id.* at 777-79. Weatherspoon challenged the Illinois Appellate Court's revised ruling in his second petition for leave to appeal, which the Illinois Supreme Court denied. Weatherspoon has thus presented Claim 1 to the Illinois Appellate Court and the Illinois Supreme Court on two separate occasions, successfully preserving the availability of federal habeas relief.

Weatherspoon's exhaustion of his state court remedies, however, cannot save his claim because the trial court's deferral on his motion *in limine* did not violate clearly established federal law. The Illinois Appellate Court held that the trial court's deferral was a (harmless) abuse of discretion, but that is not enough—federal habeas relief is only available if the state court's decision was contrary to, or an unreasonable application of, clearly established *federal* law. 28 U.S.C. § 2254(d)(1) (emphasis added). "A state court decision is 'contrary to' federal law if the state court either incorrectly laid out governing [United States] Supreme Court precedent, or, having identified the correct rule of law, decided a case differently than a materially factually indistinguishable [United States] Supreme Court case." *Muth* v. *Frank*, 412 F.3d 808, 813 (7th Cir. 2005) (citations omitted).

Weatherspoon did not submit a brief in support of his petition and consequently has not cited any United States Supreme Court case holding that a trial judge's deferral of an *in limine* ruling until after the defendant testifies is unconstitutional. The State contends that no such case exists and this court's legal research has not uncovered one. In fact, another judge in this district

addressed the same issue less than ten months ago and found "there is no clearly established federal law that requires a trial judge to decide whether a defendant's prior convictions are admissible before he testifies." *See Rials* v. *Harrington*, No. 12 C 5342, 2013 WL 6633191, at *7 (N.D. Ill. Dec. 16, 2013) (Chang, J.). Judge Chang concluded that the closest United States Supreme Court cases—*Luce* v. *United States*, 469 U.S. 38 (1984), and *Ohler* v. *United States,* 529 U.S. 753 (2000)—actually go the other way. *Rials,* 2013 WL 6633191, at *7. This court agrees. In *Luce*, the United States Supreme Court held that a defendant must testify to preserve his or her claim for improper impeachment, reasoning that the testimony allows a trial judge to weigh the prejudicial impact of a prior conviction without having to speculate about the substance of the defendant's testimony. *Luce*, 469 at 41-41. Likewise, in *Ohler*, the United States Supreme Court held that a defendant who preemptively elicits a prior conviction on direct examination to short circuit impeachment cannot appeal the admission of that evidence. 529 U.S. at 760. The Court acknowledged that the near-certain prospect of impeachment by the use of a prior conviction may deter a defendant from taking the stand, but concluded there is nothing wrong with requiring "the defendant to weigh such pros and cons in deciding whether to testify." 529 U.S. at 759-60 (quoting *McGautha* v. *California*, 402 U.S. 183, 215 (1971)). If near-certain impeachment does not unconstitutionally burden a defendant's right to testify, it stands to reason that *possible* impeachment—the occurrence of which depends on the trial judge's ruling—does not impermissibly burden the defendant's rights either. Accordingly, because there is no United States Supreme Court case requiring a trial judge to rule on the admissibility of a prior conviction before a defendant testifies, and because, as stated earlier, the two closest United States Supreme Court cases advise the opposite, this court finds there is no clearly established federal law barring the Illinois trial judge's decision to defer ruling on the admissibility of

Weatherspoon's prior convictions. Weatherspoon's Claim 1, although preserved, fails on the merits.[3]

IV. Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Proceedings for the United States District Courts, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." To obtain a certificate of appealability, the petitioner must have made a "substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2); *Slack* v. *McDaniel*, 529 U.S. 473, 483 (2000). Further, when a district court rejects a claim on the merits, the standard requires the petitioner to "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack,* 529 U.S. at 484. In order to obtain a certificate of appealability when a district court utilizes procedural grounds to dismiss a federal habeas petition, the prisoner must show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* For the reasons set forth above, Weatherspoon has not made a substantial showing that he was denied a constitutional right; reasonable jurists would not debate whether the challenges in his habeas petition should have been resolved differently or determine that Weatherspoon deserves encouragement to proceed further with his habeas claims. *See Rutledge* v. *United States*, 2230 F.3d 1041, 1047 (7th Cir.

---

[3] To the extent Weatherspoon seeks to challenge the Illinois Appellate Court's determination that the trial court's error was harmless—a position that is not articulated on the face of Weatherspoon's petition—the court need not reach the issue. The trial court's decision, while contrary to Illinois law under *Patrick*, was not contrary to federal law. The effect of the trial court's decision, whether harmless or prejudicial, is irrelevant.

2000). Weatherspoon's procedural defaults on Claims 2 through 5 were proven by the record, Weatherspoon provided no basis to excuse the defaults, and Weatherspoon's sole preserved claim—Claim 1—was decided on the merits with the deference owed to state courts under AEDPA. The court therefore declines to issue a certificate of appealability.

CONCLUSION

For the reasons explained above, Weatherspoon's petition for relief under 28 U.S.C. § 2254 [1] is denied. Weatherspoon's request for a certificate of appealability is denied with respect to all of his claims. Civil case terminated.

ENTER:

*James F. Holderman*

JAMES F. HOLDERMAN
District Judge, United States District Court

Date: September 24, 2014